Charles McLAUGHLIN, Plaintiff-Appellee,

v.

**TRELLEBORGS ANGFARTYGS A/B,**
Defendant and Third-Party
Plaintiff-Appellee,

v.

**GOLTEN MARINE COMPANY, Inc.,**
Third-Party Defendant-Appellant.

No. 51, Docket 30837.

United States Court of Appeals
Second Circuit.

Argued Dec. 2, 1968.

Decided Jan. 30, 1969.

Certiorari Denied June 9, 1969.
See 89 S.Ct. 2020.

Joseph Arthur Cohen, New York City (Alexander, Ash & Schwartz, New York City, Sidney A. Schwartz, New York City, of counsel), for third-party defendant-appellant.

Robert Klonsky, Brooklyn, N. Y., (DiCostanzo & Klonsky, Brooklyn, N. Y.), for plaintiff-appellee.

William P. Kain, Jr., New York City (Haight, Gardner, Poor & Havens, New York City, Joseph V. Fleming, New York City, of counsel), for defendant and third-party plaintiff-appellee.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and RYAN, District Judge.*

FRIENDLY, Circuit Judge:

This action in the District Court for the Eastern District of New York, in which federal jurisdiction was predicated on diverse citizenship, 28 U.S.C. § 1332, was brought by McLaughlin, a rigger employed by Golten Marine Company, against Trelleborgs Angfartygs A/B, owner of the freighter Lake Ontario, to recover for injuries caused by unseaworthiness of the vessel and Trelleborgs' negligence. Trelleborgs impleaded Golten. A jury brought in a special verdict that the ship was unseaworthy and Trelleborgs was negligent; that McLaughlin's damages were $12,000; that he had

been contributorily negligent; that his damages should accordingly be reduced by $2,000; and that he should recover $10,000 against Trelleborgs. Question then arose as to Trelleborgs' claim for indemnity. Judge Mishler, relying on Mortensen v. A/S Glittre, 348 F.2d 382 (2 Cir. 1965), considered that the finding of contributory negligence on the part of McLaughlin was conclusive of Golten's breach of its warranty of workmanlike performance (WWP) and required a recovery in the absence of evidence that Trelleborgs had prevented Golten from fulfilling its obligation. Accordingly he directed a verdict in favor of Trelleborgs on its third-party claim for $10,000 plus the taxed costs and $3,500, the agreed amount of Trelleborgs' attorneys' fees and disbursements in defending against McLaughlin's claim; he did not reduce this recovery to reflect comparative fault as requested in a counterclaim Golten had pleaded against Trelleborgs. He also dismissed another counterclaim wherein Golten had sought indemnity from McLaughlin for any liability it might incur by reason of his negligence. This last ruling was demanded by Nicroli v. Den Norske Afrika-OG Australielinie, 332 F.2d 651, 656 (2 Cir. 1964), and we shall say no more concerning the portion of Golten's appeal that relates to it.

Trelleborgs had engaged Golten to perform repair and overhaul work in the engine room of the Lake Ontario while she lay at dock in Jersey City, N. J. Needing additional help, Golten employed two riggers, McLaughlin and Kewn, at a union hiring hall. They reported to the vessel around 1 P.M.; their job was to move some engine bearings from the ship to a truck that would haul them to Golten's machine shop.

The bearings, which were oily and greasy, were lying on the floor plates of the engine room near a hoist that ran up to a platform giving access to an upper passageway and, we assume, an exit from the ship. Erickson, Golten's foreman, instructed the men to use the hoist. Kewn

placed the bearings in it and went to the platform to raise it; he was joined there by McLaughlin. They found that the hoist could not be elevated beyond a level some 2½′ below the platform. They did not report this to the ship's officers or to Erickson or explore other methods of removing the bearings, such as lowering the hoist to the floor and moving the bearings to another one. Instead, McLaughlin decided to climb into the hoist and hand the bearings out to Kewn. While attempting to do this, he slipped on the bearings and fell against the safety bar of the hoist. This came out of its slots and McLaughlin fell to the engine room floor.

In *Mortenesen,* supra, 348 F.2d 383, this court sustained the direction of a verdict on a ship's third-party claim against the employer of an injured plaintiff whom the jury had found guilty of contributory negligence. Golten attempts to distinguish *Mortensen* on the facts. In the alternative, it argues that if we should disagree on that score, the result here—where, as Golten puts it, the ship, which was found to have five-sixths of the responsibility for the accident, has succeeded in placing the entire liability plus its expenses on an otherwise guiltless employer of the man who was found to be only one-sixth responsible—is so manifestly unjust that something in the picture must be wrong.

The asserted distinction is that the employee in *Mortensen* had noticed the oil slick that caused the accident almost two hours earlier, and the employer, with this knowledge imputed to him, thus breached its WWP in failing to remedy the dangerous condition. See Drago v. A/S Inger, 305 F.2d 139, 142 (2 Cir. 1962); Nicroli v. Den Norske Afrika-OG Australielinie, supra, 332 F.2d at 656. In contrast we held in Calderola v. Cunard S.S. Co., 279 F.2d 475 (2 Cir. 1960) and Orlando v. Prudential S.S. Corp., 313 F.2d 822, 824 (2 Cir. 1963),[1] that a steve-dore could not be cast in liability for failure to correct a dangerous condition when the employee had become aware of the danger only momentarily before the accident. If Golten could be held liable to the ship solely for failure to have the hoist put in proper order or to direct McLaughlin not to enter it, this distinction of *Mortensen* might well have merit. However, while a stevedore or other third-party defendant can undoubtedly be held for failure to correct a hazardous condition or prevent its employees from exposing themselves to danger of which it has knowledge, actual or imputed, that is neither the theory of *Mortensen* nor the full measure of the liability the Supreme Court has established.

The rationale of *Mortensen* was rather that the jury's finding of contributory negligence by the third-party defendant's employee was conclusive of breach of the defendant's WWP. This followed logically from an earlier holding of ours that a finding that an injured longshoreman had negligently exposed himself to danger required entry of a judgment for indemnity, even though the employer had no real opportunity for control. Damanti v. A/S Inger, 314 F.2d 395 (2 Cir. 1963).[2] See also Shenker v. United States, 322 F.2d 622, 628–629 (2 Cir. 1963) [express warranty]; Nicroli v. Den Norske Afrika-OG Australielinie, supra, 332 F.2d at 656.

■ The *Damanti* and *Mortensen* holdings apparently rested on an imputation of the employee's contributory negligence to his employer, which was thought to render the employer negligent as a matter of law. If there had been no other developments in the law on this subject, we might indeed wonder whether it might not be useful to have that position reexamined by the court *in banc*. The similarity in name between negligence and contributory negligence masks an essential difference in concept.

1. In neither case was it found that the employee was guilty of contributory negligence.

2. The finding in *Damanti* had been made on a trial of the indemnity claim rather than of the personal-injury claim, which the ship had settled.

Whereas negligence is a breach of a duty to others and gives rise to a right in the person injured, contributory negligence is simply a disability preventing a plaintiff from recovering. See Restatement of Torts 2d § 463 (1965); 2 Harper & James, Torts § 22.10 (1956); Prosser, Torts § 64 (2d ed. 1964). A rule whereby the employee's disability automatically creates a right in the shipowner to be indemnified by the employer can thus be sound only if the employer is deemed to have undertaken not simply to use reasonable care to select, train and supervise employees so that they will protect themselves, but to furnish employees who in fact will not negligently expose themselves to injury. If the warranty were only of the more limited sort, the contributory negligence of an employee, although some evidence of breach, would not alone support a verdict in favor of the indemnitee, let alone the direction of one.

 We think, however, that, under Italia Societa per Azioni v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), the WWP is not so limited. The issue there was whether the warranty of workmanlike service "is breached where the stevedore has non-negligently supplied defective equipment which injures one of its employees during the course of stevedoring operations." 376 U.S. at 315–316, 84 S.Ct. at 749. The Court held it was. True, Mr. Justice White stated that "the implied warranty to supply reasonably safe equipment may be satisfied with less than absolutely perfect equipment," 376 U.S. at 321, 84 S. Ct. at 752, and annotated this with a citation of our *Calderola* and *Orlando* decisions, see fn. 1. However, the Court went on to say that the standard was "whether the equipment was in fact safe and fit for its intended use" and that it did not "believe a rope designed to withstand three to five times the pressure exerted on it when it gave way satisfies the standard of reasonable safety." 376 U.S. at 322, 84 S.Ct. at 757. We see no reason to suppose that the *Italia* doctrine applies only to material and not to human

resources; indeed, the Court's footnote reference to *Calderola* and *Orlando,* 376 U.S. at 321 n. 8, 84 S.Ct. 748, in support of a statement concerning equipment would not have been pertinent unless the Court considered that personnel should be treated on the same basis as rope. Putting the *Italia* criteria in human terms, while Golten did not warrant a perfect rigger, it did warrant one who would not in fact be negligent. Again, paraphrasing *Italia,* we do not consider that a rigger who stepped onto a set of oily and greasy bearings on a hoist suspended in mid-air was "safe and fit" to work on the ship or "satisfies the standard of reasonable safety." When we go behind the Court's statements to the reason given for them, namely, that "where, as here, injury-producing and defective equipment is under the supervision and control of the stevedore, the shipowner is powerless to minimize the risk; the stevedore is not," 376 U.S. at 324, 84 S.Ct. at 754, we see no basis for a different rule regarding personnel. Golten hired McLaughlin and put him to work; the ship was not consulted. While it might have been impractical for Golten to take measures that would have prevented McLaughlin's negligence, the law in this area charges the employer with the results of employee carelessness so that the decision on what precautions to take will be made upon a weighing of all relevant costs. See Proudfoot, "The Tar Baby": Maritime Personal-Injury Indemnity Actions, 20 Stan.L.Rev. 423, 433–34 (1968).

We have considered whether a different view is required by the Supreme Court's recent summary reversal, International Terminal Operating Co. v. N. V. Nederl. Stoomv. Maats., 393 U.S. 74, 89 S.Ct. 53, 21 L.Ed.2d 58 (1968), see also 393 U.S. 995, 89 S.Ct. 482, 21 L.Ed.2d 461, of our decision in that case, Albanese v. N. V. Nederl Amerik Stoomomaats 2 Cir., 392, F.2d 763. We do not think so. The issue in *International Terminal* was whether the stevedore had breached its WWP when its hatch boss allowed work to continue temporarily in

an ill-ventilated hold on the faith of a promise by a ship's officer to activate a concededly adequate ventilating system. The jury, in response to a special interrogatory, had found that the hatch boss acted reasonably. The Supreme Court reversed a ruling by a divided panel of this court that the hatch boss acted unreasonably as a matter of law; it held that the issue of the propriety of his conduct was one of fact on which the jury's determination should not have been disturbed. We are reversing no jury determination here; the jury has found that McLaughlin acted unreasonably.

Golten's remaining point is that even if all this is so, we ought to be sufficiently resourceful to find some way to avoid the apparently irrational result whereby a shipowner who supplied a defective hoist emerges scot-free and a repairman who did nothing more than innocently recruit a careless workman from a hiring hall pays the full bill for the workman's injury and the ship's defense against his claim. It is true that a desire to find some solution for the problem stemming from Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), has led members of this court to indulge in occasional murmuring about a counterclaim by the stevedore against the ship, based presumably on the ship's breach of an implied warranty to the stevedore to supply a ship where the stevedore's employees could work in reasonable safety. See Pettus v. Grace Line, Inc., 305 F.2d 151, 156 (2 Cir. 1962) (Clark, J., dissenting); Williams v. Pennsylvania R. R., 313 F.2d 203, 213 (2 Cir. 1963) (Friendly, J.). More recently, the Fifth Circuit, speaking through a judge with long experience in admiralty, said it was not "undertaking to rule for all time that in the adjustment of these complex warranties and counter warranties or promises, there may never be an acceptable, equitable basis for distributing the burden of a loss resulting from the operational cooperation of breaches or wrongs of several parties * * *." D/S Ove Skou v. Hebert, 365 F.2d 341, 350–351 &

n. 18 (1966) (John R. Brown, J.). What impresses us is that despite such expressions of desire, no court of appeals has undertaken to make them real. See Proudfoot, supra, 20 Stan.L.Rev. at 442–45. Probably that is as it should be. So long as Halcyon v. Haenn, supra, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, remains on the books, inferior federal courts will do better to abstain from further adventures in this wonderland and leave doctrinal development to the Supreme Court, unless current congressional interest in the complex problems arising from the creation of a new class of land-based seamen by the Sieracki v. Seas Shipping Co. decision, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), should result in the knot being cut in a more drastic fashion.

Affirmed.